IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF LUNA F. & KINGSTON S.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF LUNA F. AND KINGSTON S., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JAMIA S., APPELLANT.


Filed February 17, 2026.    No. A-25-492.


Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Susanne M. Dempsey Cook, of Dempsey-Cook Law Office, for appellant.

Jordan Klein, Deputy Douglas County Attorney, for appellee.


MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Jamia S. appeals from the order of the separate juvenile court of Douglas County, which terminated her parental rights to her minor child, Kingston S. Upon our de novo review of the record, we affirm the juvenile court's order.

## II. STATEMENT OF FACTS

### 1. REMOVAL AND ADJUDICATION

Jamia is the mother of Luna F., born in 2019, and Kingston, born in 2020. The children, who have different fathers, were removed from Jamia's care on February 10, 2022, and placed in the custody of the Nebraska Department of Health and Human Services (the Department) after Jamia left the children with an inappropriate caregiver. The juvenile court terminated jurisdiction

- 1 -

over Luna in August 2023. Kingston has remained in out-of-home placement since his removal from Jamia's care, except for the period from about April 19 to October 10, 2022, when he was placed with his father. We do not refer to Kingston's father or Luna further except as necessary to provide context for Jamia's appeal from the order terminating her parental rights to Kingston. We also note that Jamia has another child, born in 2025. This child is not a part of the present case, and we only refer to Jamia's pregnancy with this child as necessary to address her appeal.

On February 11, 2022, the State filed a petition in the separate juvenile court of Lancaster County, alleging that the children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and were at risk of harm due to the fault or habits of Jamia. The State also filed a motion for an ex parte order of emergency temporary custody. The accompanying affidavit recites that Jamia left the children in the care of an individual who was subsequently arrested during an illegal drug transaction; Luna was in this individual's vehicle at the time. Jamia, who was living in Iowa, had outstanding warrants in Nebraska and was arrested upon her return to Nebraska. The juvenile court granted the State's ex parte motion and ordered the Department to take temporary custody of the children. The State filed amended petitions on February 14 and 18. The operative petition specifically alleged that the children were at risk for harm because Jamia (1) failed to provide care and/or supervision for them; (2) left them with an inappropriate caregiver and/or failed to provide the caregiver with the necessary clothing, food, and other items; and (3) failed to provide a safe and stable home for them.

A protective custody hearing, commenced on February 16, 2022, was continued several times before concluding on April 12. The juvenile court continued the children's out-of-home placement and ordered the Department to offer and arrange services including "an EDN referral" for the children and an initial diagnostic evaluation, a co-occurring evaluation, and drug testing for Jamia. The court also ordered the Department to provide supervised parenting time (if parent not incarcerated).

On April 15, 2022, the Department filed a motion seeking to change Kingston's placement from his foster home to his father's home. The juvenile court approved the placement change, and following a hearing on April 19, the court ordered the Department to retain legal custody of Kingston with placement to include his father's home.

Following a hearing, the juvenile court entered an order on June 14, 2022, adjudicating the children as juveniles within the meaning of § 43-247(3)(a). The court ordered the Department to continue to offer services toward reunifying the children with Jamia and ordered Jamia to cooperate with a co-occurring evaluation and to sign releases of information as requested by the Department.

2. DISPOSITION AND REVIEW

Following a dispositional hearing on July 15, 2022, the juvenile court ordered Jamia to sign information releases as requested by the Department; report changes in contact information or employment status within 24 hours of change; maintain contact with her assigned case worker at least every other week or as directed the Department; not possess or consume alcohol or illegal drugs; submit to random drug and alcohol testing; complete a co-occurring evaluation and cooperate with recommended services; maintain a safe, stable, and sober living environment; maintain employment or other legal means of support; participate in supervised parenting time;

cooperate with her family support worker; cooperate with a "Child-Parent Dyadic Assessment"; cooperate with a Nebraska Early Development Network assessment for her children; report any law enforcement contact to her Department case manager; and ensure proper supervision of the children while in her care. The court entered similar orders following review hearings in September and December, adding the requirements that Jamia comply with the recommendations of a completed co-occurring evaluation, including completing short-term residential treatment, and completing parenting education as approved and arranged by the Department.

On October 11, 2022, the juvenile court granted the Department's motion for an emergency placement change, removing Kingston from his father's care (due to his father's alcohol use) and returning him to his previous foster care placement.

### 3. TRANSFER TO DOUGLAS COUNTY

On January 17, 2023, the case was transferred from Lancaster County to Douglas County. Following a review hearing on March 7, the separate juvenile court of Douglas County continued the children in their foster care placement and ordered Jamia to enroll in and successfully complete short-term residential treatment; not possess or ingest alcohol or controlled substances unless prescribed; undergo random, frequent, observed drug testing; maintain contact with all case professionals; sign releases as requested; obtain and maintain a legal source of income and safe and adequate housing; participate in supervised visitation with the children, which could include telephonic and video visitation while she was incarcerated; cooperate fully with a family support worker; participate in a "Child-Parent Dyadic Assessment" as arranged by the Department; and enroll in and successfully complete a parenting class. The court entered substantially similar orders (with respect to Jamia and Kingston) following review hearings on August 29, 2023, and February 20 and August 12, 2024.

### 4. TERMINATION PROCEEDINGS

#### (a) Motion

On August 23, 2024, the State filed a motion to terminate Jamia's parental rights to Kingston. The State alleged that Kingston came within the meaning of Neb. Rev. Stat. § 43-292 (1), (2), (6), and (7) (Reissue 2016) and that termination of Jamia's parental rights was in his best interests. With respect to § 43-292(6), the State alleged that in addition to failing to comply with all case plan requirements, Jamia had engaged in criminal behavior that led to her incarceration during the pendency of the case and had failed to place herself in a position to safely parent Kingston, despite being provided with reasonable efforts.

#### (b) Hearing

A termination hearing was held on May 2 and 21, 2025. The juvenile court received various documentary exhibits offered by the parties and heard testimony from two of Kingston's foster parents, Kingston's therapist, a family support worker, two Department workers, and Jamia.

Cindy Johnson was the Department case supervisor from February 2023 through February 2025; Mary Davis became the ongoing Department case manager in mid-February 2025. Both Johnson and Davis testified about the Department's provision of services to Jamia and whether Jamia had complied with her court-ordered case plan requirements, including the requirements

that she complete a co-occurring evaluation and follow any recommendations, abstain and refrain from using alcohol and illegal drugs, participate in drug testing and family support, meet with case professionals, sign requested releases, and obtain safe and stable housing and income to support herself and Kingston.

*(i) Therapeutic Evaluation and Recommendations*

Jamia completed two co-occurring evaluations, the first completed prior to Johnson's time on the case and the second in April 2025. Both evaluations recommended inpatient treatment. Jamia started inpatient treatment a few times, but she never completed treatment.

*(ii) Drug/Alcohol Use and Testing*

Jamia did not comply with the court orders to abstain from using drugs or alcohol and to participate in drug/alcohol testing. Alcohol use was a prevalent issue for Jamia throughout Johnson's time on the case. Johnson also noted additional concerns regarding methamphetamine and marijuana use. Jamia was referred multiple times for drug/alcohol testing. She was discharged by most of these providers due to her lack of engagement. There were times when Jamia was compliant with testing; at other times, she would stop returning calls from the service providers and would not test. Johnson noted two instances when Jamia admitted to substance use. In July 2023, Jamia reported her intoxication to a visitation worker and canceled a visit. On another occasion, Jamia admitted that she had last used alcohol or drugs in October 2023. Davis noted Jamia's admission to having used methamphetamine in November 2024. This concerned Davis because Jamia's report indicated that she was pregnant at the time of this drug use. Davis also noted Jamia's report in the week prior to the first termination hearing date of ongoing marijuana use. Jamia told Davis she did not know she could not use marijuana while pregnant.

*(iii) Visitation, Child Therapy, and Foster Parents*

Jamia was originally scheduled for three visits with Kingston per week. The schedule was quickly reduced in frequency due to Jamia's noncompliance. Jamia was discharged by four different visitation providers in 2022, and two more providers after that, due to her lack of engagement. Johnson testified that between February and August 2024, Jamia did not participate in visitation with Kingston and did not attend any of his medical appointments or therapy sessions. Johnson did not know whether Jamia sent Kingston letters, cards, gifts, or clothing, or provided any financial support for him during that period. She had no record of Jamia having any contact with Kingston during that period. Johnson characterized Jamia's contact with Kingston in general as "very infrequent."

Based on her review of documentation in the case file, Davis testified that Jamia and Kingston had a positive relationship but that "there is not an attachment from Kingston to Jamia." Davis testified that Jamia had been having one visit per week with Kingston since February 2025 and had not had any visits for a year prior to that. She indicated that children of Kingston's age would usually have multiple visits per week with a parent.

Kim Massara has been Kingston's therapist since February 2024. Kingston was referred to Massara for aggressive behaviors in his foster home. She diagnosed Kingston with an adjustment disorder with anxiety and depression and symptoms of neglect, based on her personal interaction

with him, a review of his background, and discussion with his foster parents. Massara noted that neglect and a lack of consistent caregiving can lead to mood swings and inadequate coping skills. Massara has spoken with both sets of foster parents during Kingston's treatment, but not Jamia. Massara provided Kingston with trauma-focused cognitive behavioral therapy and parent-child interactive therapy with one of his current foster parents to help with Kingston's attachment issues. According to Massara, when Kingston first started therapy, he did not have a solid parental relationship with his biological parents and thought that the first foster mother was his mother. Massara testified that Kingston has made some progress therapeutically, which she attributed to the consistency he was experiencing in foster care and the attachments he formed with his foster family. Massara indicated that Kingston had not expressed "a significant connection" to Jamia during therapy. Massara stressed that children need attachment and security to thrive, and she testified that if children Kingston's age do not have security and stability, they can develop behavioral issues, have issues in school, and develop inappropriate coping skills.

Latoya Carter was Kingston's foster parent from February to April 2022, and again in October 2022, after his removal from placement with his father. Kingston was placed in another foster home in April 2024 due to his aggressive behaviors in Carter's home and the level of attention he required. Carter described Kingston's routine in her home, noted Jamia's lack of contact with or support of Kingston while in Carter's care, and expressed her opinion that therapy had been beneficial for Kingston. Carter described Jamia's participation in visitation while Kingston was placed with Carter as "spotty" and inconsistent. She testified that when Kingston had visits with Jamia, most of the visits "went well" and he returned "happy," but when scheduled visits did not happen, Kingston was "very distraught."

Mitchell Hahn-Ekker has been Kingston's foster parent since April 1, 2024. Hahn-Ekker described Kingston's daily routine in Hahn-Ekker's home. Hahn-Ekker noted Jamia's lack of contact with and support for Kingston between April and August 2024. Hahn-Ekker also noted that after visits with Jamia resumed in early 2025, Kingston said he "didn't really remember [Jamia] but remembered her in his heart." Hahn-Ekker stated that Kingston does not always want to attend visits with Jamia because she and his grandfather (who was also attending the visits) were "strangers." Hahn-Ekker testified that Kingston "has . . . sadness in him" after visits and that it takes several days before Kingston is "back to himself."

### (iv) Family Support

Jamia did not comply with the court order to cooperate with family support; each time she was assigned a family support worker, she was discharged by the provider due to her noncompliance with the service.

Levette Moore became Jamia's family support worker about 7 months prior to the termination hearing. The family support goals identified in Jamia's referral for family support were obtaining housing and employment, getting an "ID," and parenting. Jamia already had housing and told Moore she was employed although she never provided Moore with proof of employment. Moore was supposed to meet with Jamia for 3 hours once a week, but according to Moore, "[I]t didn't even start out like that." Moore indicated that scheduling sessions with Jamia was difficult because she did not always answer Moore's phone calls or respond to text messages from Moore and Jamia was very "busy" when Moore tried drop-in visits. Some scheduled visits were cancelled

because Jamia was working or did not respond to Moore. Moore and Jamia only had "one session of parenting" and "nothing was completed." According to Moore, although Jamia "talked" and "complained" to Moore, Jamia "didn't really want to work on anything." When asked about Jamia's progress with her family support goals, Moore testified that "there wasn't much work done," there were "[v]ery few visits," and although Moore "was able to get [Jamia] to change her view or outlook on some things," by the time the service provider discharged Jamia for lack of participation, "the situation was worse than when [Moore] first met her." When asked if Jamia would be "a fit parent at this moment," Moore responded, "Jamia has a lot of work to do and she has to be willing to do it and when you are not willing to do the work -- I don't think so. She needs to work on herself, and she has to be willing to make some changes."

*(v) Income/Housing*

According to Johnson, Jamia reported having employment at a fast food restaurant at some point after the case was transferred to Douglas County, but she never provided any of her paystubs to the Department as proof of that employment. During Jamia's first meeting with Davis, she reported being unemployed, and Davis testified that "nothing has changed" since then. According to Davis, Jamia obtained housing in November 2024, where she still lived at the time of the termination hearing. Prior to that point, there "was a lot of couch surfing, apartments," and she was "at the Lydia House" for a few months. Her location was unknown to the Department for most of 2024, and she was incarcerated multiple times between 2022 and 2024.

*(vi) Other Case Plan Requirements*

In general, Jamia was inconsistent in engaging in services and maintaining contact with case professionals. Johnson noted barriers to communication, including Jamia's frequent phone number changes, her incarcerations, and the periods when her whereabouts were unknown. According to Davis, there had not been any gaps in communication with Jamia during her time on the case. Davis testified that Jamia was supposed to report law violations to her and indicated that Jamia had not done so.

*(vii) Best Interests*

Johnson described Jamia's progress towards reunification with Kingston as "poor." According to Johnson, Jamia has had "more than enough time" to rehabilitate herself but has been unable to provide a suitable environment for Kingston to return to, noting that the concerns present upon Kingston's removal from her care still exist. Johnson opined that Jamia is unfit to parent Kingston and that termination of Jamia's parental rights would be in his best interests. In support of her opinion, Johnson noted Jamia's inability to rehabilitate herself, to provide safe and stable housing, and to remain sober over a long period of time, as well as her "being MIA for the majority of the case."

Davis testified that Jamia had not made progress while Davis was case manager and identified Jamia's primary barriers to reunifying with Kingston as her lack of participation in her court orders and services, including her failure to submit to drug testing. Davis opined that termination of Jamia's parental rights would be in Kingston's best interests due to the longevity of

the case, Jamia's lack of compliance, and her lack of accountability for the reasons for Kingston's removal.

### (viii) Jamia's Evidence

Jamia's testimony focused on the period after the case was transferred to Douglas County. Jamia acknowledged that she did not always have a phone or email and noted a period of incarceration that ended in December 2023, followed by her residency in a domestic violence "sanctuary." According to Jamia, she requested visits at that point, but the case manager then assigned to the case did not feel it would be safe to have visits in the sanctuary. Jamia acknowledged that she was homeless until she moved into her apartment in August 2024. Jamia requested visitation again at that point but testified that visits did not start until January 2025. Jamia testified that her visits with Kingston since that time have gone "[p]retty good," and she described their activities during those visits. Jamia stated that Kingston has not had "any behaviors" during these visits and noted that she tried to "take it slow at first" while reestablishing a relationship with him. According to Jamia, she was employed "[q]uite a few times during the case," and she testified about some of those employments. Jamia expressed some dissatisfaction with the first assigned case manager after the transfer to Douglas County, whom Jamia described as being focused on getting Jamia to relinquish her parental rights to Kingston, rather than helping Jamia with her case plan requirements.

### (c) Order

On June 17, 2025, the juvenile court entered an order terminating Jamia's parental rights to Kingston. The court found clear and convincing evidence for termination under § 43-292(1), (2), (6), and (7). It did, however, dismiss for lack of evidence allegations under § 43-292(6) that Jamia had failed to obtain and maintain a legal source of income and safe and adequate housing, to maintain consistent contact with all case professionals, to complete court-ordered evaluations, and that she had engaged in criminal behavior during the pendency of the case that led to her incarceration. The court also found that Jamia was an unfit parent and that termination of her parental rights was in Kingston's best interests.

## III. ASSIGNMENT OF ERROR

Jamia assigns that the juvenile court erred in finding clear and convincing evidence to establish that termination of her parental rights was in her child's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

Jamia does not assign that the juvenile court erred in finding statutory grounds for termination of her parental rights under § 43-292 (1), (2), (6), and (7). However, for the sake of completeness, we set out how § 43-292(7) was met. Subsection (7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The record shows that Kingston has been out of Jamia's care since February 2022, well beyond the statutory period at the time the termination motion was filed in August 2024. The juvenile court did not err in finding grounds for termination of Jamia's parental rights under § 43-292(7). We need not address the court's findings under § 43-292(1), (2), and (6) since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to those subsections in our analysis of Kingston's best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

### 2. BEST INTERESTS AND UNFITNESS

Jamia assigns that the juvenile court erred in finding that termination of her parental rights was in Kingston's best interests. She acknowledges that she made some mistakes during the court process and took "some time in order to get on the path to reunification." Brief for appellant at 7. Jamia argues that a parent-child relationship does exist between her and Kingston and that she is making efforts to support and connect with him.

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. See *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.* Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id.*

The record shows that Jamia was noncompliant with her case plan for much of the time after Kingston was removed from her care. Jamia did increase her efforts to engage with her case plan requirements in the period after the termination motion was filed. She had housing at the time of the termination hearing and reportedly has had employment at various points in this case, although she never provided proof of employment to case management or other service providers. Jamia clearly has a relationship with Kingston, and the visits that have happened have reportedly gone well. However, the record does not show that Kingston has a strong parental attachment to Jamia. And, Jamia's absence from Kingston's life for long periods after removal (through her repeated incarceration and lack of contact with case management and service providers) has hampered the development of that relationship and has been harmful to Kingston. Jamia has not addressed her alcohol and drug use through consistent, regular testing; has not completed the recommended inpatient treatment; and has repeatedly been discharged by drug testing and family support providers for lack of engagement. At the time of the termination hearing, she was not in a position to safely parent Kingston, and the record does not show at what point in the future she might be in that position.

Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *Id.* Further, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L., supra*. We conclude that the State showed clear and convincing evidence that Jamia was unfit, and that termination of her parental rights was in Kingston's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Jamia's parental rights to her minor child.

AFFIRMED.